UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


RONALD JORDAN,

        Plaintiff,

v.                                        Case No. 2:08-cv-261

                                             HON. ROBERT HOLMES BELL

PATRICIA CARUSO, et al.,

        Defendants.

_____/


## REPORT AND RECOMMENDATION

        Plaintiff Ronald Jordan, an inmate currently confined at the Alger Maximum

Correctional Facility (LMF), filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against

Defendants MDOC Director Patricia Caruso, MDOC Employee Christopher Chrysler, MDOC

Employee Scott Schooley, Assistant Deputy Warden James Alexander, Resident Unit Manager

Steven Niemi, Grievance Coordinator Michael Laitinen, Case Manager Fred Govern, Resident Unit

Manager Ken Niemisto, Former Warden David Bergh, Classification Director S. Schroeder,

Chaplain Gerald Riley, Administrative Assistant Ann Barsch, Inspector J. Contreras, Guard D.

Olger, Resident Unit Manager D. McBurney, Guard T. DeJong, Resident Unit Manager C. Konrad,

and Case Manager L. Phillipson.

        In his complaint, Plaintiff alleges that he is both African American and Jewish.

Plaintiff claims that his religious beliefs require him to attend weekly Sabbath services, but that such

services are not available at LMF.  Plaintiff states that it is possible for him to attend weekly services

via video conference equipment, but that Defendants Caruso, Bergh and Riley refuse to consider

such an option.  Plaintiff also claims that Jewish law forbids the performance of any work on the Sabbath, but that he is required to work on Saturdays in violation of his beliefs.

Plaintiff alleges that on March 4, 2008, Defendant Olger searched Plaintiff's property and confiscated numerous items as being "not allowed in Level V" despite the fact that Plaintiff possessed the items while in Level V custody at the Marquette Branch Prison (MBP).  Plaintiff received a hearing on April 2, 2008, and Defendant McBurney found that all items were determined to be contraband per the notice of intent written by Defendant Olger.  Plaintiff claims that this was a denial of his due process rights.

Plaintiff claims that on March 27, 2008, Defendant DeJong confiscated three bags of coffee creamer from Plaintiff, stating that they were combustible.  Plaintiff was issued a notice of intent.  Plaintiff claims that he was allowed to possess creamer while at MBP.  On April 1, 2008, Plaintiff received a hearing and Defendant Phillipson affirmed that three bags of creamer are not allowed due to the combustibility of the material.  Plaintiff claims that this was a denial of his due process rights.

Plaintiff contends that on March 4, 2008, Defendant Olger confiscated a folder containing 43 photos from Plaintiff's legal property.  Plaintiff states that the photos were part of the police investigation file related to Plaintiff's 1982 criminal conviction.  Plaintiff states that he had been in the process of researching and preparing a motion for relief from judgment from his criminal conviction based upon the use of these photos at his trial.  Plaintiff claims that without the photos, he is unable to complete and file his motion for relief from judgment.  Plaintiff states that MDOC Policy Directive 04.07.112 allows prisoners to possess such photographs.  According to the

complaint, on March 6, 2008, Defendant Contreras issued a notice of intent to divest Plaintiff of the photos, stating:

> While reviewing incoming property, it was observed that prisoner Jordan was in possession of a homemade type photo album (43 pictures).  This album consisted of a crime scene, injuries to victim and the autopsy.
>
> Per PD-05.03.118, Section HH, states the following pose such risks within a correctional facility under all circumstances and therefore shall be rejected: #16. Official photographs of a victim at a crime scene or deplicting [sic] injuries to a victim sustained as a result of a crime that were taken for purposes of criminal investigation or prosecution.  This includes photographs of the autopsy of a victim.

Plaintiff states that the policy relied on by Defendant Contreras is the prison mail policy.  On April 2, 2008, Defendant McBurney conducted a hearing and Plaintiff provided a written statement that the materials were authorized legal materials and had never been in the mail to be affected by the mail policy.  Plaintiff explained that the materials were necessary for completing his motion for relief from judgment.   Defendant McBurney arbitrarily deprived Plaintiff of his photographs.  Plaintiff sent a letter of complaint to Defendant Caruso, to no avail.  Plaintiff also filed a grievance and appealed the denial to step III.

Plaintiff alleges that for the past 15 years, he has been screened at level II custody, but has been held in level V maximum security on the pretext that he is an escape risk based on a 1985 misconduct conviction for conspiracy to escape.  Plaintiff states that Defendants Chrysler, Schooley, Govern, Alexander, Niemi, Laitinen, Barsch, Niemisto, Konrad, McBurney and Phillipson have all approved the increased security level, stating that Plaintiff is an escape risk.  Plaintiff alleges that these same Defendants have all recommended white prisoners with histories of two or more escapes or attempted escapes for lower security levels.  Plaintiff states that the following white

- 3 -

prisoners were placed in a reduced security level despite extensive escape histories: 123622 Bowman, 171661 Cole, 122571 Collins, 171612 Coblaze, 156641 O'Brien, 164271 Jenson, 186762 Larkin, 136985 Ashley, 145861 Mithrandir, 197382 Stanfill, 184089 Siminski, 156290 Coyle, 148692 Jakupaj, 158249 Loukas, and 111984 Hoffman.  Plaintiff claims that such conduct violates his equal protection rights.

On December 5, 2008, the court dismissed Defendants DeJong and Caruso and ordered service on the remaining Defendants.  The court granted summary judgment on the majority of Plaintiff's claims on August 10, 2010 (docket #109 and #110).  Plaintiff filed an amended complaint (docket #74) adding Defendants Heinritz, Carberry and Bradley Haynie.  At this point in the litigation, the only remaining claims are Plaintiff's First Amendment claims against Defendants Bergh and Schroeder regarding being made to work on the Sabbath, and his equal protection claims against Defendants Niemi, Laitinen, Niemisto, Carberry, Haynie, Govern, and Heinritz.

Presently before the Court is Defendants' "Motion for Summary Judgment and Qualified Immunity on Plaintiff's Equal Protection Claims," filed pursuant to Fed. R. Civ. P. 56 (docket #186).  Also before the court is Plaintiff's pending motions for reconsideration (docket #202 and #223), to compel (docket #203), for extension of time to file a response (docket #213), to amend/ correct (docket #215), for extension of time to complete discovery (docket #224), for order directing Defendants to answer fourth discovery request (docket #226), for extension of time to file pretrial narrative statement (docket #234), and motion for decision of pending motions (docket #235).  In addition, Defendants have filed a motion for relief from the June 28, 2011, order directing them to allow Plaintiff to interview potential prisoner witnesses (docket #206).

Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Id.* at 324-25. The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson*, 477 U.S. at 251-52. Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. *See also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

In their brief, Defendants Niemi, Laitinen, Niemisto, Carberry, Haynie, Govern, and Heinritz assert that they are entitled to summary judgment on Plaintiff's equal protection claims because Plaintiff cannot show that he received disparate treatment by Defendants. To establish a violation of the Equal Protection Clause, a prison inmate must prove that a discriminatory intent or

purpose against a disfavored class or excluded group was a factor in an action taken by prison officials. *See McCleskey v. Kemp*, 481 U.S. 279 (1987); *Heckler v. Mathews*, 465 U.S. 728 (1984); *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 265 (1977). The typical case involves allegations that state officials have discriminated on the basis of race or gender.

Defendants initially note that Plaintiff was approved for actual placement in Level IV on October 22, 2010, and is currently housed in Level IV.[1]  (Defendants Exhibit B and C.) Defendants address each of the 57 prisoners named by Plaintiff in an attempt to show that Plaintiff did not receive different treatment than similarly situated white prisoners with regard to security classification.

      1.    <u>Prisoner screens that did not involve any of the named Defendants</u>

Defendants assert that they had no personal involvement with thirteen (13) of the prisoners named by Plaintiff. With regard to prisoners Bowman #123622, Larkin #185762, O'Brien #156641, Wesner #251337, Coyle #156290, Coblaze (a/k/a Coburn) #171612, Collins #122571, Cole #171651, Ashley #136985, Rosenberry #173287, Mowan #144479, Cibuka #133644, and Richards #121590, Defendants offer the affidavit of Pam Nelson, a Department Specialist in the MDOC Office of Legal Affairs. Ms. Nelson attests that a review of the pertinent records reveals that none of the named Defendants in this action were involved in preparing, reviewing or authorizing security classification screens or transfer orders on the above listed prisoners. (Defendants' Exhibit F.) Therefore, as stated by Defendants, these prisoners do not support Plaintiff's equal protection claims.

---

[1] However, the undersigned notes that this reduction in Plaintiff's security classification occurred more than 2 years after he filed the instant lawsuit.

2.    <u>Prisoners whose custody levels were either not reduced or were increased by Defendants</u>

Defendants state that many of the prisoners listed by Plaintiff had security classifications that were either maintained at the same level or were increased by Defendants. Defendants assert that their conduct towards these prisoners supports their claim that Plaintiff was not discriminated against on the basis of his race. Defendants offer the institutional file of prisoner Myler #181, which shows that Defendant Laitinen screened him in 2000, finding that Myler was a "new management level" of Level I, but an actual placement at Level V. Defendant Niemi screened Myler in 2001, noting that "the complex nature of the 1995 escape from the Calhoun County Jail warrants departure to Level V coupled with life sentence given 4/3/96." (Defendants' Exhibit G.)

Defendant Heinritz was involved with the preparation of a security screen and transfer order for prisoner Martel #241964, who screened as a level II, but was departed to level V with a reference to his 1995 escape attempt. (Defendants' Exhibit H.) Defendant Carberry performed a security classification screen on prisoner Stanhill #197382 on June 4, 1998, in which the prisoner was screened a New Management Level of I, but was placed at Level V. (Defendants' Exhibit J.) Defendant Laitinen performed a screening on prisoner Cobley #214866 on May 20, 1999, in which the prisoner was screened a New Management Level of I, but was placed at Level V. (Defendants' Exhibit K.)

With regard to prisoner Siminsky #184089, Defendant Heinritz approved a true security level of V on December 2, 2005, as well as an actual placement level of V. On August 27, 2007, Defendant Heinritz approved true security level and actual placement level of V, despite the fact that Siminsky screened a New Management Level of II. On June 30, 2009, Defendant Haynie approved a true security level of IV and an actual placement level of V, despite the fact that

Siminsky screened a New Management Level of I.  Defendant Haynie approved an actual placement level of IV on August 10, 2009, but on March 17, 2011, Defendant Niemisto approved a actual placement level of V, despite the fact that prisoner Siminsky screened a New Management Level of I.  (Defendants' Exhibit L.)

With regard to prisoner Cunningham #172117, on September 27, 2004, Defendant Niemi reviewed a security classification screen by Defendant Laitinen, which showed that the prisoner had a Confinement Level of II and a New Management Level of I, but also had a true and actual placement level of V.  On February 9, 2005, Defendant Laitinen screened Cunningham at Confinement Level II and New Management Level I, but a true security level and actual placement level of V.  On March 8, 2006, Defendant Heinritz approved a true security level of V, even though the inmate continued to have a Confinement Level of II and a New Management Level of I. (Defendants' Exhibit M.)

Prisoner Tyler #235674 was screened by Defendant Laitinen on December 19, 1997. Defendant Laitinen determined that Tyler was a New Management Level III, but a true security level and actual placement level of V.  On January 23, 2003, Defendant Niemi reviewed a screening which gave Tyler a New Management Level of I, but a true security level and actual placement of V.  On February 9, 2004, Defendant Niemi reviewed a screen performed by Defendant Laitinen, in which Tyler was screened at Confinement Level II, New Management Level I, and actual placement at Level V, based on Tyler's "escape history."  On March 1, 2005, Defendant Niemi reviewed a screen which was performed by Defendant Laitinen and approved by Defendant Heinritz.  The screen showed that inmate Tyler had a Confinement Level of II and a New Management Level of I, but also had a true security level of V based on his escape history.  On March 8, 2006, Defendant Niemi

reviewed a screen done by Defendant Govern, which showed an actual placement level of V, even though Tyler had a Confinement Level of II and a New Management Level of I.  On August 13, 2009, Defendant Haynie approved a true security level of IV, even though Tyler had a Confinement Level of II and a New Management Level of I, stating "Delay further security level reduction to monitor adjustment."  (Defendants' Exhibit N.)

Defendants Heinritz, Niemisto, and Niemi were involved in eight of the security classification screenings for prisoner Loukas #158249 from 1996 to 2008.  In the majority of the screenings, Loukas' Confinement and New Management Levels were II and I respectively. However, based on Loukas' overall institutional and escape history, he was kept at either level IV or V for the entire period.  On July 11, 1997, Defendant Niemi noted that Loukas' escape history makes Level IV the least restrictive security level in which he could be managed.  Defendant Heinritz approved an actual placement level of V on June 17, 2005, and again on February 13, 2007.  On February 21, 2008, Defendant Heinritz approved a true security level of IV, noting that a further security level reduction should be delayed in order to monitor Loukas' adjustment.  Loukas' continued to be maintained at level IV as of April 1, 2008.  (Defendants' Exhibit O.)

On May 27, 1999, Defendant Laitinen screened prisoner Conklin #294288 at a New Management Level of I, but at an actual placement of Level V.  (Defendants' Exhibit P.)  Defendant Heinritz approved a security classification screen and transfer order on prisoner Bosom #276835 for Level IV, despite the fact that he had a Confinement and New Management Level of II. (Defendants' Exhibit Q.)  With regard to prisoner Walker #203352, Defendants Niemi and Laitinen were involved in three screenings that placed the inmate at Level V.  (Defendants' Exhibit R.)  In 2006, Defendant Heinritz approved placement in Level V for prisoner Taylor #120631, and on July 9, 2010,

Defendant Haynie approved placement at Level IV, despite the fact that Taylor was screened at a Confinement Level of II and a New Management Level of I.  (Defendants' Exhibit S.)

Defendants Heinritz, Carberry and Haynie were involved in five of the security classification screenings for prisoner Clarey #161739 from 2005 to 2011.  Each time, prisoner Clarey was placed at Level V due to his institutional and escape history, even though he had a Confinement Level of II and a New Management Level of I.  (Defendants' Exhibit T.)  With regard to prisoner Kinney #253729, Defendant Heinritz approved a transfer order for him on January 16, 2007, stating that although Kinney had done well in administrative segregation, his overall institutional behavior required closer monitoring and continued positive behavior for Regional Prison Administrator approval of release to the general population of Level V.  (Defendants Exhibit U.)  As noted by Defendants, their treatment of these prisoners supports their assertion that they did not discriminate against Plaintiff.

   3.   Prisoners whose custody levels were reduced by Defendants

Defendants concede that they reduced the custody level of a small group of prisoners. With regard to prisoner Jakupaj #148692, Defendant Haynie was involved in a security classification screen which resulted in the inmate being transferred from Level V to IV, with a notation that the transfer had been requested for an exchange of prisoners for custody increase and decrease between LMF V and ECF IV.  (Defendants' Exhibit V.)  Defendant Heinritz indicated that prisoner Mikko #164406 had a true security level and actual placement level of V in December 1, 2005.  However, on February 13, 2006, Defendant Heinritz approved a security classification screen and transfer order that reduced prisoner Mikko's custody level to IV.  (Defendants' Exhibit W.)  On May 9, 2006, Defendant Heinritz approved a security classification screen for actual placement at level IV for

- 10 -

prisoner Couch #151030.  On March 10, 2008 and April 30, 2008, Defendants Heinritz and Niemisto maintained Couch at level IV, noting that further reduction should be delayed in order to monitor Couch's adjustment.  (Defendants Exhibit X.)

With regard to Defendant Jarvis #134949, Defendant Heinritz approved a transfer reducing Jarvis' security level to III in order to accommodate a Kosher diet and incoming administrative segregation prisoners on January 4, 2006.  (Defendants' Exhibit Y.)  On June 11, 1998, Defendant Laitinen approved a security reduction from V to IV for prisoner Mithrandir #145861 a/k/a Marsh.  (Defendants' Exhibit Z.)  On May 7, 2005, Defendant Heinritz approved a true security level of IV for prisoner Palacio #179934 a/k/a Akrawi.  On October 27, 2005, Defendant Heinritz approved a true security level of III for Palacio, although his actual placement was kept at level IV in order to facilitate access to medical care.  (Defendants' Exhibit AA.)

With regard to prisoner Teriberry #255224, Defendants Laitinen, Niemi, Govern, Niemisto, and Heinritz were involved in 10 security classification screens and transfer orders from 1998 to 2008.  On March 30, 1998, Defendant Laitinen screened Teriberry at true security level V, and again on March 21, 2001.  On March 31, 2003, Defendant Niemi screened Teriberry at true security level V.  On March 19, 2004, and April 7, 2005, Defendants Niemi and Laitinen screened Teriberry at true security level V.  Teriberry was also screened as having a true security level of V on April 11, 2006, and August 22, 2006, by Defendants Govern and Niemi.  On November 6, 2006, Defendants Niemisto and Heinritz screened Teriberry as having a true security level of IV and had him placed at that level.  On March 3, 2008, Defendant Heinritz approved a transfer to security level II.  (Defendants' Exhibit BB.)

Finally, with regard to prisoner Gould #194795, Defendant Niemisto screened him at a true security level V on September 15, 2005, but at an actual placement of IV because of a need for access to medical/mental health care.  On September 15, 2010, Defendants Niemisto approved Gould as having a true security level of IV, as well as actual placement at level IV.  (Defendants' Exhibit CC.)  The undersigned notes that Defendants' treatment of these prisoners raises an issue of fact regarding whether Plaintiff was treated differently from them on the basis of his race.

4.     Prisoners who are not Caucasian or whose files are no longer available

Defendants state that inmates Ward #138244, Black #137230, Smith #133406, Whitted #168721, Jenson #164271, Clark #257105, and Banks #107030, who are cited by Plaintiff has having been treated favorably, are not Caucasian (Defendants assert that they are African American).  Defendants assert that, therefore, their treatment of these prisoners does not support Plaintiff's claim that he received disparate treatment on the basis of his race.  In support of this assertion, Defendants offer the affidavit of Pam Nelson, a Department Specialist in the MDOC Office of Legal Affairs. (Defendants' Exhibit F, ¶ 18.)

In addition, Ms. Nelson attests that the following inmates were discharged from the MDOC and that there records were destroyed under the retention period for state records: Morton #138695 (discharged August 17, 1983), Rivers #099182 (discharged November 12, 1982), Wilson #138788 (prisoner # identified as Pepper, discharged November 2, 1980), Gamgbell #138856 (prisoner # identified as Watkins, discharged July 18, 1988), Robert Schienz (no prisoner # was provided by Plaintiff and no past or present inmate matches that name), Sanders #133644 (discharged February 10, 1991), Calvid #137644 (prisoner # identified as Grindralt, discharged December 1, 1976), Cowan #122639 (discharged September 11, 1983), Mayberry #104155

(discharged July 31, 1995), Horton #109291 (death on parole May 1, 1986), Young #108328 (discharged August 8, 1982), Tye #136838 (discharged November 16, 1989), Harless #141845 (discharged October 9, 1989), and Hoffman #111984 (administrative discharge from parole April 1, 1987). (Defendants' Exhibit F, ¶ 19.) Because no information is available regarding these prisoners, they cannot be used by Plaintiff to support his assertion that he was discriminated against on the basis of race.

Defendants conclude that of the inmates listed by Plaintiff, twenty-one (21) have had their records destroyed, were not identifiable by prison number, or were not Caucasian. Defendants had no personal involvement with an additional thirteen (13) named inmates. Fifteen (15) inmates were departed to a higher security classification by Defendants based on their institutional or escape history. Six (6) inmates were reduced to Level IV, and two (2) inmates were reduced to Level III or lower. Defendants state that inmate Jarvis is the only inmate who was reduced from Level IV to Level III by Defendants without any departure upward, noting that inmate Teriberry was initially departed to a higher security level and then was reduced first to Level IV, and then to Level III. Defendants contend that, based on these numbers, Plaintiff cannot show that there was a pattern of discriminatory conduct.

Defendants also state that Plaintiff's own institutional history required him to be confined in a higher security prison. Defendants assert that some of the reasons for Plaintiff's length of confinement in Level V include the 1981 murder of another inmate, as well as a participating in a conspiracy to escape, which included a plan to murder two MDOC officers who were assigned to transport Plaintiff to state court proceedings. (Defendants' Exhibit DD, ¶¶ 9-12, 16-22.) From 1985 to 2006, Plaintiff received misconduct tickets for substance abuse, sexual misconduct, creating a

disturbance, inciting to riot, insolence, and disobeying a direct order.  On July 9, 2007, Plaintiff was found guilty of writing a letter to another prisoner stating that someone should murder a named MDOC employee "in the most painful means imaginable."  On July 19, 2007, Plaintiff was reclassified to administrative segregation at the Marquette Branch Prison based on a review of the major misconduct hearing report for the July 9, 2007, misconduct ticket.  Plaintiff remained in administrative segregation after he requested a Special Problem Offender Notice (SPON) be issued in order to prevent him from being housed in the general population at a facility where the employee he had threatened was working.  In the written request, Plaintiff cited to the misconduct conviction, the fact that he had stated "in the most painful means imaginable" in the prior threatening letter, and the fact that he is serving time for multiple murders.  Plaintiff also noted that a SPON should be issued when an offender is likely to represent a genuine threat and when there is a specific threat of violence by an offender.  On November 2, 2007, the Security Classification Committee found that Plaintiff presented a specific and credible risk to the staff member he had threatened and, consequently, to the good order of the facility.  (Defendants' Exhibit DD, ¶¶ 25-27.)

Defendants contend that Plaintiff's institutional history shows that he is "a highly manipulative and dangerous individual" who requires the highest levels of security to keep staff and other inmates free from harm.  Therefore, Defendants assert that they are entitled to summary judgment on Plaintiff's equal protection claims.

Plaintiff has not filed a response to Defendants' motion.  Instead, Plaintiff has a filed motion for extension of time to file a response (docket #213), as well as numerous other motions which will be addressed below.  In Plaintiff's motion for extension of time to respond to the motion for summary judgment, he seeks 30 days from the time that his pending motions to compel discovery

have been decided. At the time that Plaintiff filed this motion for extension of time, he had filed a motion for reconsideration of the denial of his second motion for the production of documents (docket #202) and a motion to compel the Defendants to answer all of the questions set forth in his second interrogatory (docket #203).

With regard to the motion for reconsideration, Plaintiff now states that he requires the requested documents to identify prisoners who could testify for Plaintiff. However, the requested documents are too broad and vague to have any immediately apparent bearing on the pending motion for summary judgment. Therefore, Plaintiff's motion for reconsideration (docket #202) is properly denied. However, this is not the case with regard to the motion to compel. In that motion, Plaintiff asks the court to overrule Defendants' objections to providing the criminal convictions/sentences for each identified prisoner, the misconduct histories for each identified prisoner, the security placement of each of the Caucasian prisoners before and after a misconduct conviction, and the current location for each of the 56 identified prisoners. With regard to Plaintiff's request for the criminal history of each identified prisoner, Defendants state that they object to providing such information because it is not relevant and not likely to lead to discoverable evidence. Defendants further state that a prisoner's institutional history is the main determinant of his security placement and not his criminal conviction or sentencing history. Finally, Defendants note that Plaintiff has indicated that his family is willing to assist him in prosecuting this case and assert that this information is obtainable by a Freedom of Information request made by Plaintiff's associates outside of prison.

As noted above, of the names listed by Plaintiff, six (6) inmates were reduced to Level IV, and two (2) inmates were reduced to Level III or lower. Defendants contend that because Plaintiff was transferred to Level IV two years after filing this lawsuit, he was treated in the same

fashion as the named inmates who were reduced to Level IV.  However, each of the six Caucasian inmates who were reduced from Level V to IV received the security classification reduction much sooner than Plaintiff.  Therefore, there appears to be an issue of fact regarding whether Plaintiff was treated differently from eight (8) of the named prisoners on the basis of his race.  Because it is possible that Plaintiff could discover evidence supporting this assertion if allowed to discover the criminal convictions/sentences, the misconduct histories, and the security placement before and after a misconduct conviction of each of the eight Caucasian prisoners who received reductions from the named Defendants to Level IV or lower, Plaintiff should be allowed discovery of this information with regard to the eight Caucasian prisoners who received reductions from the named Defendants to Level IV or lower.  These prisoners are Jakupaj #148692, Mikko #164406, Couch #151030, Jarvis #134949, Mithrandir #145861 (a/k/a Marsh), Palacio #179934 (a/k/a Akrawi), Teriberry #255224, and Gould #194795.  Therefore, Plaintiff's motion to compel (docket #203) is properly granted with regard to the above named prisoners.  Moreover, because there continues to be an issue of fact regarding Plaintiff's equal protection claims, Defendants are not entitled to a grant of summary judgment on Plaintiff's this issue.

Similarly, Plaintiff seeks an order compelling Defendants to comply with his fourth discovery request, which concerns one prisoner, James Gainforth #179409, who was sentenced to life for murder.  Plaintiff claims that Gainforth made three (3) escape attempts during his incarceration, but that he was not placed in Level V until after the third attempt and that he was reduced from Level V to Level IV after nine years.  Plaintiff is seeking Gainforth's criminal and institutional history, which he claims will show that the only basis for treating Gainforth differently

is that he is Caucasian.  Because the requested information is pertinent to Plaintiff's equal protection claim, the motion to compel as to prisoner Gainforth (docket #226) is properly granted.

Defendants have filed a motion for relief (docket #206) from the court's June 28, 2011, order directing Plaintiff to be allowed to conduct telephone interviews of no more than 50 witnesses is properly denied, in part.  As noted above, the only inmates listed by Plaintiff who potentially support his argument are prisoners Jakupaj #148692, Mikko #164406, Couch #151030, Jarvis #134949, Mithrandir #145861 (a/k/a Marsh), Palacio #179934 (a/k/a Akrawi), Teriberry #255224, and Gould #194795.  Therefore, Plaintiff should be allowed to conduct telephone interviews with these prisoners, as well as with James Gainforth #179409, who was named by Plaintiff on October 5, 2011 (docket #226).  However, because Plaintiff has not provided the names of any additional witnesses, Defendants' motion for relief (docket #206) is properly granted in all other respects.

Plaintiff's motion for extension of time to file a response to the motion for summary judgment (docket #213) is properly denied as unnecessary based on the recommendation to deny Defendants' motion for summary judgment.  Plaintiff also seeks an order correcting the case title to indicate that the lead defendant is Laura Heinritz.  However, such an amendment has no bearing on the substance of this case.  The docket sheet clearly reflects which Defendants have been terminated and which remain active.  Therefore, Plaintiff's motion (docket #215) is properly denied.  Plaintiff seeks reconsideration (docket #223) of this court's September 8, 2011, order denying the appointment of counsel.  For the reasons stated in the September 8, 2011 order, Plaintiff's motion for reconsideration is also properly denied.

Plaintiff also seeks an extension of time to complete discovery (docket #224) in order to respond to the motion for summary judgment, which is properly denied as unnecessary based on the recommendation to deny Defendants' motion for summary judgment. In addition, Plaintiff has moved for an extension of time to file a pretrial narrative statement (docket #234). This motion is properly granted and Plaintiff will have until April 9, 2012, to file his pretrial narrative statement. Finally, Plaintiff has filed a motion for decision on his pending motions (docket #235), which is properly denied as moot.[2]

In the alternative, Defendants argue that they are entitled to qualified immunity on Plaintiff's equal protection claims. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir.2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Determining whether the government officials in this case are entitled to qualified immunity generally requires two inquiries: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Id.* at 538-39 (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir.2006)); *cf. Pearson v. Callahan*, --- U.S. ----, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (holding that the two-part test is not longer considered mandatory; thereby freeing district courts from rigidly, and potentially wastefully, applying the two-part test in cases that could more efficiently be resolved by a modified application of that framework).

---

[2]These motions will be addressed by separate order issued the same date as this report and recommendation.

It is well established that the Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike.  U.S. Const., amend. XIV; *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). Where there is a genuine issue of material fact as to whether Defendants' conduct was motivated by a desire to discriminate against Plaintiff because of his race, they are not entitled to qualified immunity.

In summary, in the opinion of the undersigned, Plaintiff has sustained his burden of proof in response to Defendants' motion for summary judgment.  Accordingly, it is recommended that Defendants' Motion for Summary Judgment (docket #186) be denied.

NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).  Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).

 /s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated:  January 24, 2012